UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| LUTHER A. HARTHUN,<br><br>                          *Plaintiff,*<br><br>            v.<br><br>JOHNSON CONTROLS, INC.,<br><br>                          *Defendant.* | CASE NO. 3:20-cv-00036<br><br>MEMORANDUM OPINION & ORDER<br><br>JUDGE NORMAN K. MOON |

      This case is about whether Johnson Controls, Inc. ("JCI"), ran afoul of the Employee Retirement Income Security Act of 1974 ("ERISA"), when it modified its senior executive benefits plan. Previously, JCI directly paid premiums for Medicare Part B and for a supplemental Medicare plan for each of its eligible retirees (including Plaintiff Luther Harthun). In 2020, JCI continued to pay premiums for Medicare Part B for its eligible retirees, but instead provided a Healthcare Reimbursement Account by which they were reimbursed for premiums for the supplemental coverage option they selected. The Court concludes that the Plan Document afforded JCI discretion in administering the plan, and that this was a discretionary decision that was not contrary to the Plan's plain language nor an unreasonable interpretation of the Plan. The Court will award summary judgment to JCI.

Background

      Plaintiff Luther Harthun was a senior executive at Figgie International, Inc., until he retired in 1996. Dkt. 1 ¶¶ 6, 8. He was a "Participant" within the meaning of Figgie's Senior Executive Benefits Program, effective on August 28, 1991 (the "Plan Document"). *Id.* ¶¶ 1, 7; *see also* Dkt. 1-1 (the Plan Document). After a name change and two mergers, Figgie's corporate

1

successor-in-interest to the Plan Document is Johnson Controls International plc; its subsidiary JCI became plan administrator. *Id.* ¶¶ 9–12.

Plaintiff alleged that during his time as a Plan Participant until December 31, 2019, "the Plan has paid one hundred percent of Plaintiff's health insurance premiums directly." *Id.* ¶ 18. "To the best of Plaintiff's knowledge, he has never paid a health insurance premium under the Plan and has always participated in a health insurance program offered to employees of the Company." *Id.*

In an August 2019 letter, JCI informed Plaintiff that his "current retiree health benefit(s) program under Johnson Controls will end on December 31, 2019," and the letter "provided [him] with the details on the next steps for enrolling in a Mercer 365+ Retiree benefit plan(s)." Dkt. 1-2 at 2; *see also* Dkt. 1 ¶ 20. The letter described this as a "private health insurance solution that offers eligible post-65 retirees and their eligible post-65 dependents a variety of health insurance options from which to choose." Dkt. 1-2 at 2. The letter further informed Plaintiff that enrollees through the Mercer Marketplace 365+ Retiree "*will pay your premiums directly to the insurance company that you choose for your healthcare coverage.*" *Id.* at 4 (emphasis added). In addition, the letter explained that a healthcare reimbursement account or "HRA account, funded by Johnson Controls will be established for you and your eligible dependent(s) to help you pay for the monthly premiums." *Id.*

In Plaintiff's view, this change in terms conflicted with the Plan's language and his "entire history as a Participant in the Plan, in which Plaintiff did not pay any health insurance premiums or bear any administrative burden with respect to such premiums." Dkt. 1 ¶ 22. Plaintiff complained to JCI about the change. On September 30, 2019, JCI responded in a letter treating Plaintiff's complaint as a claim under ERISA and denying that claim, holding that the

change "to the manner of [JCI's] providing your health care benefits … do[es] not violate the terms of the Program." Dkt. 1-3 (letter); Dkt. 1 ¶¶ 23–25. In the letter, JCI specifically noted that in "Section 8.2 of the Program, while JCI must continue secondary medical coverage for you, the amount of such secondary coverage need only be '*equivalent to*' the coverage provided to active company employees; the Program does not require that you be enrolled in an active employee plan." Dkt. 1-3 (emphasis in original). JCI further explained that it had "carefully considered and determined that the coverage you will be able to obtain via Medicare Part B, and the secondary coverage you will be able to purchase via the Mercer Marketplace 365+ Exchange … using the monthly HRA contribution of $185, is at least equivalent to that of active employees." *Id.* Thus, JCI concluded that it had "complie[d] with the terms of the Program." *Id.*

JCI advised of Plaintiff's right to appeal the decision. Dkt. 1-3. Plaintiff, through counsel, timely appealed the decision but did not receive any ruling or other communication from JCI in the 90 days following Plaintiff's submission of his appeal. Dkt. 1 ¶¶ 25–26; Dkt. 1-4 (appeal); Dkt. 8 ¶ 26 (answer, admitting 90 days passed following submission of appeal without any ruling or other communication from JCI to Plaintiff).

Plaintiff thereafter brought this ERISA action pursuant to 29 U.S.C. § 1132(a)(1)(B), which permits "a participant or beneficiary" to bring a civil action "to enforce his rights under the terms of the plan." Dkt. 1 ¶ 32. In the complaint, Plaintiff argued that JCI's change to the Mercer Marketplace program violated Section 8.2 of the Plan Document, which provided that the Company "pay all premiums required to maintain such coverage under the Group Medical Plan." *Id.* ¶ 30. In addition, Plaintiff contended that Section 8.2 of the Plan Document required JCI to "continue the coverage of a Participant … under the company's Group Medical Plan," which is defined as "any program, plan or insurance contract of the Company, to the extent, if any, that it

3

provides hospitalization, dental, surgical, or major medical benefits for the *employees of the Corporate Staff of the Company.*" *Id.* ¶ 28 (emphasis in original). In Plaintiff's view, JCI's decision that "the Program does not require that you be enrolled in an active employee plan" "directly contradicts the plain and unambiguous language" of Section 8.2. *Id.* Accordingly, Plaintiff sued for a declaration that JCI's letter decision of September 30, 2019, "is contrary to the terms of the Plan Document and therefore void and of no effect." *Id.* ¶ 33(a). In addition, Plaintiff sought a declaration that "Plaintiff is entitled to participate in a Group Medical Plan for employees of the Corporate Staff of the Company." *Id.* ¶ 33(b). Plaintiff also sought attorney's fees and costs. *Id.* ¶¶ 33(c)–(d).

Before the Court are the parties' cross motions for summary judgment and the parties' responses thereto. Dkts. 20–23, 25–26. The Court heard argument on the motions, and the matter is ripe for decision.

Standard of Review

At the outset, the parties' submissions raise several disputes regarding the applicable standard of review: first, whether an abuse of discretion or *de novo* standard of review applies; and second, whether a "modified" abuse of discretion standard is appropriate on account of a conflict of interest.

A court is required to "review de novo an ERISA benefits determination unless the plan confers discretionary authority on its administrator." *Woods v. Prudential Ins. Co. of Am.*, 428 F.3d 320, 321 (4th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)). An ERISA plan can confer discretion on its administrator expressly by language that creates discretionary authority or implicitly by terms creating such discretion. *Id.* at 322 (internal quotation marks omitted). Whether express or implicit, the plan must "manifest a clear intent to

confer such discretion," with ambiguities construed against the drafter. *Id.* However, if the plan confers discretionary authority on the administrator, "the standard for review under ERISA of a fiduciary's discretionary decision is for abuse of discretion," which the court "will not disturb … if it is reasonable." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000).

On the first question, in their briefs, both sides acknowledged that an abuse of discretion standard applied. *See* Dkt. 23 at 6–7 (Plaintiff's brief, writing that "Under ERISA, a denial of benefits is reviewed for abuse of discretion."); Dkt. 21 at 8–9 (JCI's brief, writing that "[a]n abuse of discretion standard governs this case"); Dkt. 26 at 4 (Plaintiff's opposition brief, writing that he "does not quarrel with the presence of discretionary authority in the Plan Document"); Dkt. 25 at 2. Plaintiff's argument was that JCI's interpretation of the plan was unreasonable and thus an abuse of discretion under the *Booth* factors. Dkt. 23 at 7 ("These factors … demonstrate that JCI abused its discretion here."); Dkt. 26 at 2–4.

At oral argument, Plaintiff appeared to argue for the first time that a *de novo* standard should instead apply, because one section of the Plan Document cited by JCI as a source of discretionary authority (Section 13.3) only provided for the resolution of ambiguities in the context of an appeal of a denial of benefits. However, as JCI's counsel noted in their response, another part of the plan explicitly provides comparable discretionary authority outside of the context of appeals. Section 13.1 states, in relevant part: "[t]he Compensation Committee shall have the following powers and duties," including "[*t*]*o interpret the Program, and to resolve ambiguities, inconsistencies, and omissions*, *and to determine any question of fact, to determine the right of benefits of, and the amount of benefits, if any, payable to, any person in accordance with the provisions of the Program*." Dkt. 1-1 at 55 (emphasis added). Thus, the Court finds that

explicit language sufficiently clear that the Plan Document conveyed discretionary authority on JCI, warranting application of the abuse of discretion standard. *See, e.g.*, *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008) (holding that plan language "giving Eaton 'discretionary authority to determine eligibility for benefits' and 'the power and discretion to determine all questions of fact … arising in connection with the administration, interpretation and application of the Plan' is unambiguous," warranting application of the abuse of discretion standard).

On the second question, Plaintiff argued in his opening brief that the abuse of discretion standard "is modified where, as here, the plan administrator (JCI) has a conflict of interest due to a financial interest in the outcome of the decision." Dkt. 23 at 6 (quoting *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997)). Accordingly, the Plaintiff contended that "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the … decision must be and the more substantial the evidence must be to support it." *Id.* at 6–7 (quoting *Ellis*, 126 F.3d at 233)). However, the Fourth Circuit has subsequently noted that its "prior modified abuse-of-discretion standard [was] no longer applicable," and that "instead, courts should view any such conflict of interest as but one factor among the many identified in *Booth* for reviewing the reasonableness of a plan administrator's discretionary decision." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 631 (4th Cir. 2010). The Court will follow the recent articulation of the standard.

In the ERISA context, the abuse of discretion standard "equates to reasonableness," such that a court "will not disturb an ERISA administrator's discretionary decision if it is reasonable," but it "will reverse or remand if it is not." *Evans*, 514 F.3d at 322. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by

6

substantial evidence," with "careful attention" being paid to the plan requirements and the rules of ERISA itself. *Id.* (quotations and citations omitted). The following are a non-exhaustive list of factors relevant to that inquiry: "the Plan's language, the materials the administrator consulted in reaching its decision, whether the Plan has been interpreted consistently, whether the decision was consistent with the procedural and substantive requirements of ERSIA, the existence of any external standard relevant to the exercise of discretion, and the fiduciary's motives and any conflict of interest it may have." *Wilson v. United Healthcare Ins. Co.*, 27 F.4th 228, 238 (4th Cir. 2022) (citing *Booth*, 201 F.3d at 342–43) (cleaned up). In any event, faced with language that, as here, confers discretion upon a plan administrator, the Fourth Circuit has also cautioned that a court must follow "its duty of deference and its secondary rather than primary role in determining a claimant's right to benefits." *Id.* at 323.

Analysis

Plaintiff argues that JCI violated the Plan by attempting to cancel Plaintiff's former plan in "favor of a new 'marketplace' program that would require substantial out of pocket expense and administrative burden" for him. Dkt. 23 at 1. Plaintiff's argument primarily focuses on the terms of Section 8.2 of the Plan, especially its provision that "The Company shall continue the coverage of a Participant, his Spouse and his dependents under the company's Group Medical Plan after the termination of the Participant's employment." *Id.* at 2–3; Dkt. 1-1 at 46. Plaintiff also cites Section 8.2's language that "The Company shall pay all premiums required to maintain such coverage under the Group Medical Plan." Dkt. 23 at 3; Dkt. 1-1 at 46. In Plaintiff's view, the Plan entitles him to "remain on the Group Medical Plan, i.e., the medical plan offered to corporate staff of the Company, and to have JCI continue to pay all of [his] premiums as JCI and

its predecessors have done for 30 years." Dkt. 23 at 7; *see also id.* at 6–9. Plaintiff also argues that the other *Booth* factors weigh in his favor. *Id.* at 9–14.

JCI disagrees. JCI emphasizes that the Plan "expressly confers discretionary authority with regard to benefits decisions." Dkt. 21 at 8. In JCI's view, not only has Plaintiff failed to show that JCI abused its discretion, but JCI demonstrated that it acted reasonably. *Id.* at 9–10. JCI acknowledges that the Plan "contains ambiguous and inconsistent language," but argues that rather than reading sentences of the Plan "in isolation" to argue that Plaintiff is entitled to remain on JCI's active employee plan, construing the relevant provisions together supported JCI's position. Dkt. 25 at 4–5, 10–11. That is, that the Plan permitted JCI to make the modification so long as JCI provided Plaintiff with medical coverage that was "equivalent to" that which was provided to active employees. *Id.* at 10–11. JCI also argues that the other *Booth* factors either weighed in its favor or did not warrant a contrary conclusion.

Turning first to the language of the Plan, the Court concludes that its terms support JCI's interpretation—that JCI was not required to keep Plaintiff on the same plan as active employees of the company. Rather, the Plan required JCI to pay premiums to afford Plaintiff an equivalent level of coverage to those on the active employees' plan. *See Lockhart v. United Mine Workers of Am. 1974 Pension Tr.*, 5 F.3d 74, 78 (4th Cir. 1993) ("[t]he award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself").

Section 8.2 does state that "[t]he Company shall continue the coverage of a Participant, his Spouse and his dependents under the Company's Group Medical Plan after the termination of the Participant's employment …." Dkt. 1-1 at 46. (And to be sure, in Section 1.23 of the Plan, "Group Medical Plan" is defined as "any program, plan or insurance contract of the Company to the extent, if any, that it provides hospitalization, dental, surgical or major medical benefits for

8

the employees of the Corporate Staff of the Company." *Id.* at 15.) But Section 8.2 goes on to state in the very next sentence that "[t]he amount of coverage to be continued pursuant to this Section 8.2 shall be *equivalent to the level of coverage* in effect from time to time thereafter with respect to Participants *who are actively employed by the Company*." *Id.* at 46 (emphases added). Were JCI required to keep Plaintiff (and all other Participants) on the same plan as those "who are actively employed by the Company," *id.*, the earlier Plan language stating that the amount of coverage "shall be *equivalent to*" that afforded active employees would be of no effect. "ERISA plans, like contracts, are to be construed as a whole," *Johnson v. Am. United Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 2013) (citations omitted), and thus courts must construe their terms "giv[ing] meaning and effect to every part of the contract, rather than leav[ing] a portion of the contract meaningless or reduced to mere surplusage," *Goodman v. Resol. Tr. Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993). The Court is loath to construe the Plan as Plaintiff would have the Court do, which would render meaningless the portion of Section 8.2 stating that the amount of coverage "shall be *equivalent to*" that afforded active employees.

Section 8.2 also provides that "The Company shall pay all premiums required to maintain *such coverage* under the Group Medical Plan." Dkt. 1-1 at 46 (emphasis added). But that does not necessarily mean, as Plaintiff argues, that JCI was required to continue directly paying premiums for Plaintiff to be enrolled in the active employees' plan. The Plan says no such thing. Rather, Section 8.2's provision that JCI must pay premiums required to "maintain *such coverage*," refers back to the earlier line of Section 8.2 that provides that "[*t*]*he amount of coverage to be continued … shall be equivalent to the level of coverage in effect … with respect to Participants who are actively employed by the Company*." *Id.* (emphases added). In other words, a reasonable—and indeed, the most reasonable—construction of these provisions is that

9

the Plan required JCI to "pay all premiums required to maintain" an "amount of coverage … equivalent to the level of coverage in effect" for active employees—*not* that JCI was required to keep those with continuing coverage on the plan for those "actively employed by the Company." *Id.* Moreover, the Court also finds significant that that is Section 8.2's only reference to "active employees" is in the "equivalent to" sentence. That also reasonably suggests, at least within Section 8.2, that the Plan did not intend references to "Group Medical Plan" to be synonymous with the plan currently in place for active employees.

Finally, an exchange at oral argument demonstrated the unreasonableness of Plaintiff's construction. Plaintiff's position is that the Plan requires he be on the active-employees' health insurance, regardless whether he otherwise would have been entitled to any coverage from Medicare. But it would make little sense for the Plan to ignore otherwise-available Medicare coverage for its retirees. Nor did it. Rather, the Plan clarified that: "In addition, the Company shall pay all premiums needed to provide coverage under Part B of Medicare until the later of" the Participant's death or that of his spouse. Dkt. 1-1 at 46.

To be sure, certain terms of the Plan are not a model of clarity, as JCI has acknowledged. However, the Court concludes that the most reasonable interpretation of the relevant provisions of the Plan are that it required JCI to pay premiums to afford Plaintiff an equivalent level of coverage to those on the active employees' plan, not that JCI was required to maintain Plaintiff on the active-employees' plan itself. Moreover, the Plan entrusted JCI to "interpret the Program, and to resolve ambiguities, inconsistencies, and omissions." Dkt. 1-1 at 55. The Court cannot conclude that JCI's construction of these provisions of the Plan was an unreasonable one or constituted an abuse of discretion.

The other *Booth* factors do not counsel in favor of a contrary conclusion. In this case, the "purposes and goals of the plan" factor does little to move the needle. *Booth*, 201 F.3d at 342. The Plan was enacted "to attract and hold highly competent senior management executives so that [the Company] may compete effectively," and one way it did so was by "provid[ing] certain retirement, death, disability and medical benefits for its senior executives and their spouses and dependents commensurate with those offered by other companies." Dkt. 1-1 at 4. Those purposes of the plan do not disappear when the company was renamed or merged with another company. But, significantly, those purposes would not appear to be undermined (at least in any meaningful way) by JCI's interpretation of the Plan, so long as the premiums paid were sufficient to provide an amount of coverage "equivalent to" active employees as the Plan requires. *See id.* at 46.

The Court turns next to the "adequacy of the materials considered to make the decision and the degree to which they support it." *Booth*, 201 F.3d at 342. There is no dispute that JCI consulted various materials, including an "impact analysis" concerning the estimated cost of premiums that retirees like Plaintiff might have to pay under coverage options. *See* Dkt. 21-2 ¶¶ 9–12; Dkt. 21-1 at 91–97. Plaintiff calls the volume of materials "sparse." Dkt. 23 at 10. Perhaps there could have been more. But Plaintiff did not submit other materials for JCI's consideration that it failed to consider. And in any event, more significant is the substance of the materials consulted than their volume. The analysis provided support for JCI's conclusion, namely that they thought $185 monthly would be sufficient to cover the average premium for supplemental Medicare options for retirees like Plaintiff, which they calculated was between $35 and $140 per month. *See* Dkt. 21 at 6; Dkt. 21-1 at 91; Dkt. 21-2 ¶¶ 9–12. Plaintiff argues that the relevant comparison of benefits was not between 2020 and 2019, but rather 2020 compared with 1996 (when he retired) or 2001 (when he argues there was last a Significant Management

Change under the Plan). *See* Dkt. 23 at 11. Even if a more fulsome analysis might have been conducted, Plaintiff did not introduce any contrary evidence into the administrative record. Nor has Plaintiff complained about any prior deterioration of benefits before the 2019-2020 change. It was not unreasonable for JCI under these circumstances to consider these materials comparing the cost of coverage between those specific years (2018-2019), rather than comparing benefits back to 2001 or 1996. This factor does not show any unreasonableness.

The parties' arguments about whether JCI's interpretation was "consistent with the other provisions in the plan and with earlier interpretations of the plan," *Booth*, 201 F.3d at 342, track their arguments on the first, considering the "language of the plan." *See, e.g.*, Dkt. 23 at 11–12; Dkt. 25 at 10–11. This factor, like the first, weighs in JCI's favor. Similarly, the parties' arguments about whether JCI's decision-making process was "reasoned and principled" simply track earlier arguments made with respect to the interpretation of Plan terms, and whether JCI was required to rely on any other materials in making its decision. *See Booth*, 201 F.3d at 342; *see also* Dkt. 23 at 12; Dkt. 25 at 11.

There are two *Booth* factors that weigh in Plaintiff's favor. The first is the failure of JCI to timely respond to Plaintiff's appeal. *Booth* provides that the Court should consider whether the plan administrator's decision "was consistent with the procedural and substantive requirements of ERISA." 201 F.3d at 342. ERISA regulations require plan administrators to "establish and maintain a procedure by which a complaint will have a reasonable opportunity to appeal an adverse benefit determination … and under which there will be a full and fair review of the claim and adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(1). For reasons unknown to the Court, JCI did not engage in or respond to Plaintiff's appeal. JCI calls it a "procedural irregularity," Dkt. 25 at 11, but to call it that is to diminish the opportunity Plaintiff should have

had to present his arguments to JCI and for JCI to consider and respond to them, in the first instance. That said, this is but one of the factors the Court is to consider. In addition, the Court notes that this case particularly depends upon the language of the relevant Plan documents rather than, for example, underlying medical evidence. In that regard, any adverse consequences of JCI's failure to conduct the appeal are mitigated here, as Plaintiff and the Court are not without material documents in the record.

Finally, the Court notes that this is a case in which JCI has a conflict in that it is both the administrator and the payor of claims under the ERISA plan. *See* Dkt. 23 at 13; Dkt. 25 at 13. Indeed, there is little dispute that such a conflict exists. *See id.* Rather, as JCI argues, this is but one factor among the others identified in *Booth* for the Court to consider in reviewing whether JCI's discretionary decision was reasonable. *See Williams*, 609 F.3d at 631. JCI argues that the financial conflict is greatly lessened under the circumstances of this case, because it "has continued to pay [Plaintiff's] premiums for Part B of Medicare," and it "was willing to continue to pay the premiums associated with [his] medical coverage," but just "changed the manner and method through which it would provide such coverage." Dkt. 25 at 13. To be sure, any financial conflict here is not presented in such stark terms as it would if a plan administrator is deciding whether to approve (and pay for) or deny a plaintiff's claim. And Defense counsel acknowledged at oral argument (as they had to), that if retirees' premiums increase over time, JCI would have to "go back and recalculate" HRA reimbursements, because the Plan provides that qualifying retired participants under the Plan are to receive an amount of coverage "*equivalent to*" that afforded active company employees. On the other hand, the record does not establish that JCI is expending *greater* sums than it had previously under the new "marketplace" program, and it would not be unreasonable to think that JCI enacted a change with a motivation of achieving

some savings at some point. Thus, while this factor does weigh somewhat in Plaintiff's favor, it does not to a great degree.

## Conclusion

The Court therefore concludes, accounting for and weighing the applicable *Booth* factors and the Plan language and record, that JCI did not act unreasonably in determining that the Plan permitted JCI to pay for premiums for Participants like Plaintiff through an HRA model, so long as the amount of those premiums corresponded to an "amount of coverage" that was "equivalent to" that afforded active employees. The Plan Document afforded JCI discretion in administering the plan, and that this was a discretionary decision not contrary to the Plan's plain language nor an unreasonable interpretation of the Plan. Moreover, weighing the applicable *Booth* factors, the Court concludes that JCI did not act unreasonably. For these reasons, the Court will **GRANT** Defendant JCI's motion for summary judgment (Dkt. 20) and **DENY** the Plaintiff's motion for summary judgment (Dkt. 22).

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to all counsel of record.

Entered this 31st day of March, 2022.

*[Signature: Norman K. Moon]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE